# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0381V
UNPUBLISHED

| | |
|---|---|
| SHARON CAMPBELL,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>January 4, 2023<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Presyncope; Vasovagal Response. |

*John Robert Howie*, Howie Law, PC, Dallas, TX, for Petitioner.

*Amanda Pasciuto*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On April 3, 2020, Sharon Campbell filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. On March 9, 2022, I determined that Petitioner established causation-in-fact based upon an influenza ("flu") vaccine received on September 17, 2018. *See generally* Entitlement Ruling (ECF No. 40). I specifically found that Petitioner had carried her burden of establishing off-Table injuries including a presyncope vasovagal

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

response, leading to inpatient hospitalization and surgical interventions on her left knee. Entitlement Ruling at 16.[3, 4]

However, the parties could not resolve the quantum of damages (solely pain and suffering) to be awarded, and therefore have briefed their dispute for my resolution. Petitioner's Damages Brief filed July 13, 2022 (ECF No. 49); Respondent's Brief filed August 4, 2022 (ECF No. 51); Petitioner's Reply filed August 23, 2022 (ECF No. 52). For the following reasons, I find that Petitioner is entitled to an award of **$190,000.00 (representing actual pain and suffering).**

## I. Relevant Factual History

I have reviewed all of the evidence filed to date. This ruling, however, is limited to determining facts pertaining to Petitioner's pain and suffering. Accordingly, I will only summarize or discuss evidence that directly pertains to this issue.

### A. Contemporaneous Medical Records

Petitioner was 64 years old and employed full-time as a histology specialist at Massachusetts General Hospital ("MGH"), where she received the subject flu vaccine during an outdoor clinic on September 17, 2018. Ex. 2 at 1; Ex. 7 at 187.[5] Upon walking away, she became "woozy," fell down several stairs, and was transported on a stretcher into the MGH emergency room ("ER"). Ex. 5c at 95. She rated her initial pain at 9-10/10, received IV Dilaudid (hydromorphone), and was admitted for a likely fracture of the left tibia and fibula. *Id.* at 96-98, 102, 111-13; *see also id.* at 237-38 (CT scan).

On September 19, 2018, orthopedic surgeon R. Malcolm Smith, M.D., performed the first surgical intervention, which involved an open reduction – involving a 20 cm (7.9 inch) incision to expose the lower femur, knee, tibia, and fibula – followed by internal

---

[3] Petitioner could not establish a Table claim of vasovagal syncope because she did not lose consciousness after the vaccination. Entitlement Ruling at 10 (citing 42 C.F.R. § 100.3(c)(13)). "Presyncope, also known as 'near-syncope,' is the prodrome of syncope without the loss of consciousness." Entitlement Ruling at 12 (internal citations omitted).

[4] The Entitlement Ruling's prior summary of the procedural history and facts is fully incorporated and relied upon herein. This Decision expands upon aspects that are relevant to the parties' arguments, as well as my ultimate determination, of the appropriate damages award.

[5] Petitioner contacted occupational health about her injury that same day. Ex. 7 at 187, 801-03. She initiated a workers' compensation claim, which was approved later that month. *Id.* at 41-43.

fixation of a metal plate and several screws to stabilize the left tibial plateau fracture. Dr. Smith also repaired a lateral meniscus tear. He stapled the incision closed. Ex. 5c at 138-39, 477; *see also* Ex. 25a (x-rays). He assessed that Petitioner also had "very poor bone quality," putting her at risk for further fractures. Ex. 5c at 129. An endocrinologist concurred that Petitioner "may have" previously untreated osteoporosis, for which daily supplemental vitamin D and calcium was recommended. *Id.* at 129-33. *Id.*[6]

On September 22, 2018, Petitioner was discharged home. She was given a knee immobilizing brace to wear for 8 –12 weeks; prescription-strength Tylenol (acetaminophen), and oxycodone (to take as needed). Ex. 5c at 93.

On September 24, 2018, Petitioner underwent a home-based PT evaluation. Ex. 5c at 522. She also had six home health visits. Ex. 5c at 547, 601; Ex. 5d at 22, 61, 96, 125. Her pain ranged from 2 – 10/10 and she required assistance to ambulate. *Id.*

At the October 9, 2018, orthopedics follow-up, the surgical wound was healing well. Ex. 5d at 173. The knee's range of motion was improving, but there was still "aching discomfort." *Id.* The knee displayed "a little bit of valgus."[7] *Id.* If the valgus progressed, she might require a knee replacement. *Id.* That same week, Petitioner was discharged from home health care. Ex. 5d at 226-27. During four further home-based PT sessions, Petitioner expressed concern about the prospect of further surgeries and further time away from work. Ex. 5d at 263-64, 294, 409, 468.

At the next orthopedics follow-up on December 11, 2018, Petitioner was "feeling well" without "much pain." Ex. 5d at 632. Repeat x-rays (*id.* at 611) reflected that the fracture was healing. *Id.* at 632. However, due to her poor bone quality, there was some "some subsidence and subsequent valgus alignment." Consequently, one of the surgically inserted screws was "backing out," which (the orthopedist explained) "might cause some pain while ambulating." *Id.* at 632. However, Petitioner was cleared to remove the brace, bear weight on her leg as tolerated, start out-patient PT, and return to

---

[6] Dr. Weil also recommended additional testing to confirm the suspicion of osteoporosis and to determine whether pharmacotherapy was warranted. Ex. 5c at 133. Subsequent medical records reflect that Petitioner's primary care provider planned to schedule a DXA scan; "If it is abnormal to the point of requiring treatment… Dr. Weil will be the one to follow her since she consulted on [Petitioner's] case." Ex. 5c at 438. However, no further work-up for osteoporosis or follow-ups with Dr. Weil occurred.

[7] Valgus is defined as "bent or twisted outward; denoting a deformity in which the angulation of the part is away from the midline of the body." *Dorland's Medical Dictionary Online*, www.dorlandsonline.com (hereinafter "*Dorland's*") (definition of "valgus").

work 20 hours per week. Ex. 5d at 611; *see also* Ex. 7 at 107-08 (work approval letter); Ex. 5e at 9-13. 26 (first two PT sessions, reflecting pain rating of 5/10).

On January 9, 2019, Petitioner reported increased pain and decreased range of motion. Ex. 5e at 78 (reflecting pain rating of 6/10). A repeat x-ray confirmed the same subsidence, valgus, and hardware instability. *Id.* at 91. Petitioner's care was then transferred to another orthopedic surgeon, John Guido Esposito, M.D. *Id.* at 122-23.

In the interim, Petitioner rated her pain on average as 4/10; ambulated with a cane; and worked part-time. However, her activities remained limited (e.g., she was unable to walk more than a mile, bend, kneel, or stoop). Ex. 5e at 201-02, 260, 285-87, 295-296, 404-05.

On March 6, 2019, Dr. Esposito surgically opened the previous incision; removed the existing hardware; debrided and irrigated the knee; implanted antibiotic bone cement spacer at the proximal tibial defect; and closed the incision with staples. Ex. 5e at 526 (operative note);[8] Ex. 26 (post-operative x-ray images). Petitioner was hospitalized for this procedure and discharged three days later – again, with a knee brace and prescription pain medication. Ex. 5e at 221-683 (hospitalization records). She also started another full-time leave of absence from work. She followed with Dr. Esposito and underwent home health and home-based PT treatment. Her pain ranged from 4 – 8/10 for the first few weeks, then decreased to 4 – 5/10. She ambulated with a rolling walker and used the left leg only for balance (touch-down weight bearing, or "TDWB"). Ex.5f at 76, 97, 149, 193, 208, 222, 284, 322, 352, 426, 460, 483, 536, 558; Ex. 5g at 88.

On May 29, 2019, Dr. Esposito surgically opened the previous incision; performed a total knee arthroplasty (replacement); and again closed the incision with staples. Ex. 5g at 284-87 (operative note); *see also* Ex. 26 (post-operative x-ray images). She was discharged the following day. Ex. 5g at 290. During approximately one month of home health and home-based PT sessions, Petitioner rated her pain at 5-10/10. Ex. 5g at 440, 476, 536-37, 552; Ex. 5h at 31, 93, 122, 258, 262.

On June 13, 2019, the surgical staples were removed. Ex. 5h at 154-55. Her pain was "well-controlled and appropriate for her level of recovery," and she was transitioned from oxycodone to tramadol. *Id.* at 154, 164.

---

[8] The operative note inadvertently states, "right knee," but there is no dispute that the March 6, 2019, surgery was on Petitioner's left knee.

4

At a June 25, 2019, initial outpatient PT evaluation, Petitioner rated her pain at 6-8/10. She had decreased ROM and strength in the left knee, pelvic instability, and deviated gait. She would work to "eliminate or reduce" these symptoms in formal sessions, tentatively twice a week for four months. After the symptoms "subside[d]," Petitioner would progress to a home exercise program. Ex. 8 at 2-3.

At a July 11, 2019, orthopedics follow up, Petitioner was doing well and making progress with swelling and range of motion. She had no pain with gentle motion of the knee, and good stability, strength, alignment, and sensation. She was taking prescription acetaminophen and ambulating with a cane. The orthopedic surgeon, Dr. Esposito, noted their "detailed" discussion about the "rehab plan and prognosis." Ex. 5h at 523-24. On August 9, 2019, he authorized a return to work part-time (4 hours per day). Ex. 7 at 178.

On August 10, 2019, Petitioner submitted to a different orthopedic surgeon's independent medical examination ("IME") for her workers' compensation claim. Ex. 7 at 171-77. The IME concluded that the post-vaccine fall was the "the major contributing cause of her left knee condition by causing a comminuted tibial plateau fracture, which then developed a malunion and hardware failure, and an eventual total knee replacement." *Id.* at 175-76. She was not a candidate for any further surgery. *Id.* at 176. She required additional PT and a home exercise program, and she would not reach maximum medical improvement "until at least" the following spring. *Id.* at 176; *see also* Ex. 8 at 4-25 (PT sessions).

On August 23, 2019, the treating orthopedic surgeon recorded that Petitioner's knee range of motion was further increased ("0 to 90 degrees of flexion") and she was no longer using a cane to ambulate. The rehab plan and prognosis were again discussed, but not recorded. Petitioner would follow up again in approximately one year. Ex. 5h at 595-96. One month later, Petitioner was authorized to work full-time with restrictions on repetitive bending, squatting, kneeling, stair climbing, and walking. Ex. 7 at 800.

By December 23, 2019, Petitioner had completed a total of 37 PT sessions. Her activities of daily living and ambulation tolerance were "improving." She had improved strength on break tests, but easy fatigue; improved mechanics of gait with verbal cues; and continued functional limitations including ambulation endurance, navigating stairs, bed mobility, and driving. She would "continue [a home exercise program] independently and contact clinic and MD if progress [did] not continue as expected." Ex. 8 at 62-63.

There are no further medical records pertaining to Petitioner's left knee for over six months. Then, on July 2, 2020, a repeat x-ray visualized that the total knee replacement was aligned normally, intact, and showed no evidence of loosening. Ex. 13 at 95.

However, the left leg had a "mild residual valgus angulation." *Id.* Petitioner reported an "occasional knee ache which [was] tolerable." *Id.* at 132. Her range of motion was further increased ("0 to 100 degrees of flexion"). *Id.* The orthopedic surgeon assessed that she was "doing well" and had "made progress with therapy"; he did not plan any further treatment. *Id.* at 133. Petitioner would follow up with repeat x-rays in one year. *Id.*

The next medical records are from March 21, 2022, when Petitioner returned to the same PT practice. She reported that her chronic left knee pain had worsened over the last two months and was currently rated at 3 – 8/10. Ex. 24 at 2. She had abnormal gait; difficulty climbing stairs; left knee flexion deficits (80 degrees, compared to 130 degrees); and decreased muscle strength (with pain and spasms). *Id.* The therapist appeared to recommend additional formal PT, *id.* at 3, but there are no further records.

### B. Affidavits

Before her injury, Petitioner reports, she had enjoyed an active lifestyle featuring daily walks as well as skiing and bowling. Since the September 2018 injury, however, she has suffered from persistent weight gain; diminished stamina, balance, and range of motion; knee swelling over the course of the day; a limp by the end of the work week; disrupted sleep; and less independence in her daily life. Ex. 1; *see also* Ex. 27 at ¶¶ 1-3 (her supplemental affidavit); *accord* Ex. 28 (affidavit of her older son).

Petitioner averred that in July 2020, her orthopedic surgeon did not offer any further treatment for her ongoing pain, swelling, and impairments. Ex. 27 at ¶ 4.[9] She acquiesced to merely following up in a year – but missed that appointment after her younger son passed away suddenly and unexpectedly in April 2021. *Id.* at ¶ 5. At that point, she received extended bereavement leave from work and deferred further evaluations of her knee, especially in light of the prior explanations that "nothing more could be done." *Id.* at ¶ 6.

### II. Authority

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks

---

[9] Ex. 27 at ¶ 6 states that Petitioner last saw the orthopedic surgeon "in July of 2021." This is a typo. The last appointment was in July *2020. See* Ex. 13 at 132-33.

compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[10] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013). In *Graves,* the Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the

---

[10] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

7

Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of how pain and suffering is to be calculated herein, it makes sound points about the functioning of the statutory cap.

### III.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times, Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of her injury. Petitioner averred that she should be compensated $250,000.00 – whether that figure is designated solely for her actual pain and suffering or involves some future component. Brief at 2. In reaction, Respondent stated that the evidence supported only actual pain and suffering, and a lesser award of $150,000.00. Response at 1.[11]

In performing this analysis, I have reviewed the record as a whole, including all medical records, affidavits, declarations, and all other filed evidence, plus the parties' briefs and other pleadings. My ultimate determination is based on the specific circumstances of this case. In addition, in any case in which the parties cannot agree to a damages component, I have considered my experience adjudicating damages generally – including the fact that even the most self-limiting and transient of vaccine injuries from an immediate-impact stance can have "significant treatment consequences." *Hietpas v. Sec'y of Health & Hum. Servs.*, No. 19-1702V, 2021 WL 688620, at *5 (Fed. Cl. Spec. Mstr. Jan. 15, 2021) (recognizing that intussusception can necessitate surgical intervention).

Because most vaccine injury claims involving syncope, presyncope, and vasovagal response are resolved informally, there are few reasoned decisions that can guide this outcome. Petitioner urged comparison to past damages decisions concerning shoulder injuries related to vaccine administration ("SIRVA") – and specifically those resulting in between two to three (most often arthroscopic) surgeries, with awards of

---

[11] Respondent has again argued for a pain and suffering "continuum" – on the basis that Congress created the $250,000.00 statutory cap while contemplating "very serious" injuries – such as paralysis, encephalopathy, and seizure disorders – "involv[ing] severe neurological and other complications that would require lifelong medical care." Response at 11-18. Here, Respondent averred that Petitioner's injury is comparatively less severe, and thus, should not receive the statutory maximum. *Id.* at 18. Nevertheless, Respondent accepted *Graves* "to the extent it calls for an individualized assessment of damages based on the specific facts of a petitioner's case," *Id.* at 11 - which is in fact the proper the focus of the analysis.

between $200,000.00 - $210,000.00 for actual pain and suffering. Brief at 19-20.[12] Respondent agreed that such cases "may be helpful in consideration of surgical treatment for a vaccine injury," even though the specific injuries differed. Response at 19. And it is certainly true that SIRVA cases requiring surgery typically are associated with higher awards. However, the existing case law has not (to date) drawn a distinction based on whether surgical intervention is arthroscopic or more invasive, as Petitioner has argued for here.

Moreover, any damages award takes into account multiple factors – including the scope and extent of other treatment efforts. For example, *Meirndorf* (full citation at note 12, *supra*) involved surgery plus "three steroid injections, five laser treatments, two joint injections…" *Meirndorf*, 2022 WL 1055475, at *2. And in *Lawson*, the injured party received seven cortisone injections, and then started platelet-rich plasma ("PRP") injections four years into the course of treatment. *Lawson*, 2021 WL 688560, at *1-3. The damages awards took into account these additional interventions – making clear that surgery is not the only relevant factor (even if it supports a higher-than-average award otherwise).

In adjudicating damages for a given injury, a more helpful benchmark will generally be past decisions on similar injuries with similar potential symptoms, treatment interventions, and outcomes. *See Gunter v. Sec'y of Health & Hum. Servs.*, No. 17-1941V, 2020 WL 662141, *4 (Fed. Cl. Spec. Mstr. Oct. 13, 2020) (declining to consider a past damages award for syncope, upon awarding damages for SIRVA). But as already noted, such on-point cases specific to syncopal, presyncopal, and vasovagal injuries and their sequelae are hard to come by. Thus (and as I have done in other cases where necessary), settled matters also give some guidance. *See,* e.g., *Hietpas*, 2021 WL 688620, at *5.[13]

---

[12] Citing *Elmakky v. Sec'y of Health & Hum. Servs.*, No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021) (awarding $205,000.00 for actual pain and suffering); *Lawson v. Sec'y of Health & Hum. Servs.*, No. 18-0882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) ($205,000.00); *Welch v. Sec'y of Health & Hum. Servs.*, No. 18-0074V, 2021 WL 1795205 (Fed. Cl. Spec. Mstr. Apr. 5, 2021) ($210,000.00); *Meirndorf v. Sec'y of Health & Hum. Servs.*, No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. Mar. 7, 2022) ($200,000.00).

[13] Citing *Edwards v. Sec'y of Health & Hum. Servs.*, No. 18-0138V, 2019 WL 7597444 (Fed. Cl. Spec. Mstr. Dec. 13, 2019) (awarding $100,000.00 for actual pain and suffering for syncope, fractured jaw, ruptured eardrum, chin laceration, and fractured teeth); *Hoelzel v. Sec'y of Health & Hum. Servs.*, No. 17-1987V, 2018 WL 7220754 (Fed. Cl. Spec. Mstr. Dec. 19, 2018) ($100,000.00 for actual and projected pain and suffering for syncope, concussion, dental fractures, and permanent facial scarring); and *Aholt v. Sec'y of Health & Hum. Servs.*, No. 12-0055V, 2012 WL 2866119 (Fed. Cl. Spec. Mstr. June 18, 2012) ($100,000.00 for actual and projected pain and suffering for syncope and various injuries to face, jaw, and teeth). For

9

In *Hietpas*, a syncope followed by facial bone fractures, suturing, surgery, physical therapy, and a splint warranted an award of $140,000.00 for actual pain and suffering. *Id.* at * 5-6. In the present case, Ms. Campbell alleged that her own treatment course was "considerably longer and considerably more involved," therefore supporting a significantly higher award. Brief at 19. Respondent contended that *Hietpas* was in fact roughly comparable, based on his characterization hat the *Hietpas* petitioner "underwent *multiple* jaw surgeries." Response at n. 8. This may be due to an inadvertent reading of *Hietpas* – potentially, an interpretation of the initial suturing as surgery, when it in fact seemed like a preliminary and less invasive measure - meaning *Hietpas* in fact involved only one surgery.

I find that the present case warrants a higher award than in *Hietpas*. Petitioner's initial course was more severe - including *three* surgeries each resulting in a brief hospitalization, prescription pain medication, and limited range of motion and weightbearing. This case also reflects more significant life disruptions – namely, medically excused extended absences, totaling approximately one year, from Petitioner's employment. In contrast, *Hietpas* involved a teenager without extended absences from school (although she described foregoing certain extracurricular activities such as volleyball). This case also documents a greater number of PT sessions – 37, compared to only seven in *Hietpas*.[14]

After approximately one year, in September 2019, Petitioner was permitted to return to work full-time but with restrictions. The subsequent medical records also support that she had reduced but persistent pain, weakness, and motion deficits. The December 2019 PT record notes these residual symptoms and does not explain the discharge to a home exercise program – e.g., whether that was Petitioner or the therapist's decision. I recognize Petitioner's recollection that in July 2020, her orthopedist explained that she would always have some residual deficits even with additional treatment. However, the orthopedist's records are imperfect and do not address the PT's suggestion of additional formal sessions "if progress [did] not continue as expected." There is also no evidence that Petitioner sought pain medications or additional accommodations at work prior to the loss of her son in April 2021. I accept that such an event could reasonably have reduced an individual's capacity to seek medical treatment for a chronic injury. The March 2022 PT reevaluation also reflects objective, ongoing deficits with no clear evidence of any

---

each case, the medical details were alleged in the petition and subsequently in the decision approving the parties' agreed-upon proffer.

[14] Petitioner also asserted emotional suffering as a result of post-surgical permanent and significant scarring on her leg. Brief at 19. I find that such scarring is roughly equivalent to the "permanent scarring on [the vaccinee's] chin" in *Hietpas*, 2021 WL 688620, at *6.

alternative cause.[15] Thus, Petitioner's ongoing deficits, however mild, are substantially attributable to the vaccine injury – consistent with the conclusions of her treating providers and an IME.

Overall, I conclude that Petitioner's pain and suffering was severe to moderate for nearly one year. Her pain and suffering have since persisted, albeit at a more mild level, to date – but they are not sufficiently documented to support a separate award for future pain and suffering. She is thus entitled to an actual pain and suffering award of $190,000.00.[16] While the initial injury itself at issue was transient and seemingly minor, the impact of that event was uncommonly severe – justifying a fairly high pain and suffering award.

## Conclusion

Based on the record as a whole and the parties' arguments, I award Petitioner a lump sum payment of **$190,000.00 (for actual pain and suffering).** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[15] Likewise, I do not find sufficient objective evidence that Petitioner's condition worsened in early 2022.

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. See § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.